WILLIAM BRIGHAM & another *vs.* EDWARD D. PETERS & others

The declarations of an agent, although accompanied by acts, are inadmissible in favor of a third person against the principal, to prove the extent of the agent's authority.

A witness testified, that as he was standing at a door opening on the street, he saw L., sitting in a vehicle before the door, write, as the witness supposed, upon some papers handed him by his clerk; but that he was not near enough to see what L. wrote; that he afterwards went up with the clerk into the counting-room, and the clerk had there some signed and indorsed notes, the same (the witness testified) that were handed back by L. to his clerk. *Held,* that the witness was not competent to testify as to the genuineness of a signature on another note, purporting to be the signature of L.

A teller of a bank, who as such has paid many checks purporting to be drawn by a person who has a deposit account with the bank, but has not seen him write, is incompetent to testify to the handwriting of such person, if some of the checks so paid were forged.

Evidence, that the name of the payee, indorsed on a promissory note, is the signature by which his business was transacted at the time of the indorsement, is admissible to prove the indorsement binding upon him, without proving it to be in his own handwriting.

When an agent applies a note held by his principal to the payment of a debt of the principal, the principal, if he fails to disavow the act of the agent as unauthorized, within a reasonable time after the transaction with all the circumstances connected with it comes to his knowledge, will be presumed to have ratified and adopted it.

TROVER by William Brigham and John C. Dodge, assignees of George Lambert, an insolvent debtor, for a promissory note for $578, dated January 11th 1850, signed by W. & F. H. Whittemore & Company, and payable in six months after its date to the order of Lambert, and purporting to be indorsed by him. Writ dated September 13th 1850.

At the trial in the court of common pleas, before *Perkins,* J. the ground upon which the plaintiffs sought to recover was, that the note had never legally passed out of the hands of Lambert, nor out of their hands, by indorsement or otherwise. The grounds of defence were that Lambert's name was indorsed by him, or by his clerk B. F. Wellington, by his authority; that the note, before its maturity, was delivered by Wellington, in payment of a debt of Lambert's, and by his authority, to Samuel A. Way; and that the defendants received it from Way, before maturity, in the usual course of business, in good faith, for a valuable consideration, and without notice.

There was evidence tending to show that Wellington, from March 1849 to the end of May 1850, had charge of the business

of Lambert, who was partially disabled by lameness from attending to his business personally, and that, among other things, Wellington had general power to raise money on the business notes and other notes and property belonging to Lambert, and to pay Lambert's debts. There was also evidence tending to show that at various times, between the middle of February 1849 and April 1850, Wellington, with the knowledge of Lambert, wrote Lambert's name, imitating his signature, upon many notes, both as promisor and indorser, which notes were applied to Lambert's use in transacting his business; and in like manner signed numerous checks, upon which money was drawn from the Grocers' Bank, and applied to Lambert's use.

John Wetherbee, Jr. a witness for the defendants, testified that in 1849, at the request of Wellington, he discounted a draft payable to Lambert, and Wellington thereupon publicly, on the counter of Wetherbee's office in State Street, indorsed the name of Lambert on the draft, imitating his signature, and thereupon received the amount of the draft from Wetherbee, and reached to a small piece of square paper, and made a minute of a bank deposit of the money, with George Lambert's name on it, and put the money with the minute in a deposit bank book, and went across State Street, as the witness supposed, to make a deposit.

There was also evidence tending to show that Lambert borrowed of Way large sums prior to the year 1849, some of which were borrowed for him by Wellington, and that on the 19th of June 1849, through the agency of Wellington, Lambert borrowed of Way five hundred dollars, and Wellington gave Way a borrowed and received note for that amount, payable on demand, signed " George Lambert by B. F. Wellington," and gave Way, as collateral security therefor, business notes belonging to Lambert; that Wellington had authority to borrow money upon borrowed and received notes so signed; and that the sum of five hundred dollars so borrowed was applied to Lambert's use · That Way retained said $500 note until the 31st of January 1850; that prior to the 29th of said January, Way exchanged the business notes, so held as collateral security, for another busi-

ness note belonging to Lambert, signed or purporting to be signed by one Noyes; that prior to the 26th of the same month, Lambert had negotiated certain notes signed by him, payable to his own order, and indorsed by him, among which was one for $275, which he passed to one Gardner for a valuable consideration; that this note for $275 was offered for sale in State street, which was made known to Lambert by Way through Wellington; that Lambert thereupon directed Wellington to take up the $275 note, and that Wellington thereupon induced Way to buy it, and agreed with him, in case he could do so, to give him good business paper therefor; that on said 26th of January, Way purchased the $275 note of a broker; and on the 29th of January, Wellington took up the note of Noyes and gave Way in lieu thereof the note for $578 for which this suit was brought, agreeing in a day or two to bring in other business paper and take up the $500 note and the $275 note; and that accordingly, on the 31st of said January, Wellington gave Way said $578 note and a note of William M. Jackson for $208.79, payable to the order of said Lambert and purporting to be indorsed by him, and received the $500 note and the $275 note; and said $275 note was produced by the plaintiffs at the trial upon notice given by the defendants, and was used by the defendants in evidence.

There was also evidence tending to show that Lambert, before his insolvency, was informed that said $578 note and the note for $208.79 were so given by Wellington to take up the $500 note and the $275 note, and that he said it was all right.

The defendants proposed to prove by Wetherbee that Wellington, at the time of indorsing Lambert's name on said draft, stated, in explanation of said act, that he had authority from Lambert so to sign his name. But the court refused to admit the testimony.

Joseph B. Norris testified, that in the fall of 1849, as he was standing at the door of No. 111 State street, he saw Lambert sitting in a buggy in the street in front of said door; that Wellington handed some papers to Lambert, and held an inkstand and gave him a pen, as if to have him write something

on the paper; that Lambert took a check book, as he sat in the buggy, and placed it on his hat, and rested said papers on it, and as witness supposed, wrote on them. What Lambert wrote, if any thing, the witness was not near enough to see, and could not say; but after Lambert went away, the witness went up with Wellington into the counting room, and Wellington had there some signed and indorsed notes, "the same," the witness said, "that were handed back to Wellington."

The defendants proposed to ask this witness whether the name of Lambert, indorsed on the note in controversy, was the genuine signature of Lambert; on the ground that the witness had seen Lambert write, or had seen signatures which he knew to be Lambert's, and was therefore qualified to give his opinion upon that point. But the court, not deeming the witness, from this testimony, so qualified on either ground, did not allow the question to be put to the witness.

Charles H. Smith testified, that he was paying and receiving teller of the Grocers' Bank, and had been so from the 21st of May 1849, and that he had paid there a large number of checks drawn in the name of George Lambert, who had a deposit of money at the bank. This witness had never seen Lambert write; and the only evidence to show that any of these checks were in Lambert's hand writing, was the testimony of Lambert himself, who stated that a part of said checks were genuine, and a part of them, much the larger part, forged. Smith had paid those said by Lambert to be forged, when presented, and also those said by Lambert to be genuine, believing them all to be genuine.

The defendants then proposed to ask this witness whether the signature of Lambert on the note in controversy was genuine; but the court not being satisfied of his competency to give his opinion on that point, rejected the evidence.

Wetherbee, upon showing himself competent to give an opinion, was allowed to state, and did state, that in his belief the signature on the note in controversy was the genuine signature of Lambert; but he also testified that he had had Lambert's notes and checks; that he became familiar with his signa-

ture; that in 1848 or 1849 he saw Lambert write his name; and that he had frequently seen in Wellington's possession notes signed and indorsed in blank by Lambert, and that he had frequent transactions with Wellington on Lambert's account. And Matthew Bolles, another witness for the defendants, testified that a year or more before 1850, Lambert came into his office and desired him to transact business with Wellington and make loans to him on Lambert's account, as he would with Lambert himself; that he frequently took, in the course of his business with Wellington, acting on Lambert's account, notes bearing the name of Lambert.

The defendants offered to prove by Wetherbee and Bolles that the signature on the back of the note sued for was the signature upon which Lambert's business had been transacted in 1849 and part of 1850; but as the defendants did not propose by this evidence to show that Lambert wrote the name himself; · and as there was strong evidence that a large number of notes and checks bearing the name of George Lambert, not signed by himself, were at the time in circulation, without his authority, on a part of which some of the business of Lambert had been done during those periods, without his knowledge, the court rejected the evidence.

The defendants contended that, if the $275 note and the $500 note were debts of Lambert, and the $578 note and the $208.79 note were passed by Wellington to take up the same, the same having been appropriated to the use of Lambert, the plaintiffs could not recover, and the defendants would be entitled to retain the $578 note, whether the indorsement thereon was or was not rightly made, and especially as neither Lambert nor the plaintiffs had returned or offered to return the notes for $275 and $500; and if the jury should find that Lambert directed the $275 note to be taken up, and the note sued for was applied to that purpose, that the plaintiffs could not recover, but the defendants would be entitled to retain the same until the $275 note was returned or offered to be returned, even if the $500 note was not a debt of Lambert.

The court instructed the jury that, if they should find that

the $275 note and the $500 note were the debts of Lambert, and that the note sued for was passed to Way towards taking up and paying the same, these facts, in themselves, would not be a conclusive defence in law to this action, although the whole transaction afterwards became known to Lambert, and he had done nothing to repudiate it; but the existence of these facts, and the failure of Lambert to repudiate the transaction, would be strong evidence in favor of the defendants to show either original authority in Wellington, or a subsequent ratification of his act in signing the name of Lambert.

The defendants requested the court to rule that, if the $578 note was appropriated as aforesaid in payment of Lambert's debt, the plaintiffs could not recover without returning or offering to return the $275 note and $500 note. But the court declined so to rule, and ruled that if the $578 note was so appropriated, and neither the plaintiffs nor Lambert returned or offered to return the $500 note and the $275 note; yet these facts would not in law be a defence to this action; but that the not returning or offering to return the same was strong evidence to show that Lambert had authorized or ratified the indorsement.

The defendants also asked the court to instruct the jury that, if Wellington in any one case, before passing the $578 note, wrote the name of Lambert as indorser on any negotiable paper, imitating his signature, and put the same in circulation; and Lambert had either expressly authorized the same, or afterwards, knowing of the same, had acquiesced in it, he would be bound by any like indorsement, thereafter made by Wellington on negotiable paper, in the hands of a *bona fide* holder, although such signature might have been misused by Wellington, and he would be bound by the indorsement of the $578 note in the hands of a *bona fide* holder, if the same was made by Wellington. But the court refused so to instruct the jury, and ruled that if Lambert had authorized Wellington to sign his name in one instance, or acquiesced in his signing it in one instance, this would not necessarily bind him on like signatures thereafterwards made by Wellington; but would be strong evidence to show authority in Wellington so to indorse and circulate

notes, and from which the jury would be justified in finding an authority so to indorse and circulate.

The jury returned a verdict for the plaintiffs; and the defendants alleged exceptions to the foregoing rulings and instructions.

*B. F. Brooks*, for the defendants.

*W. Brigham & J. C. Dodge*, pro se.

DEWEY, J.   The statement of Wellington to Wetherbee, at the time of indorsing Lambert's name on a draft discounted by Wetherbee, that he had authority from Lambert to sign his name, was properly rejected.   The declarations of a professed agent, however publicly made, and although accompanied by an actual signature of the name of the principal, are not com petent evidence to prove the authority of such agent, when questioned by the principal.  *Mussey* v. *Beecher*, 3 Cush. 517. *Tuttle* v. *Cooper*, 5 Pick. 417.   In a suit between the principal and a third person, it is quite enough to allow, as the law does, the agent to testify under oath, to his authority to act for the principal.

2. The court also properly rejected Norris as incompetent to testify to the genuineness of the signature of Lambert.   Whether this witness ever saw any signatures, that were the genuine handwriting of Lambert, was sufficiently questionable to authorize his rejection.   Before being admitted to testify as to the genuineness of a controverted signature from his knowledge of the handwriting of the party, a witness ought, beyond all question, to have seen the party write, or be conversant with his acknowledged signature.

3. The question as to the rejection of the testimony of Charles H. Smith, to the handwriting of Lambert, is one of more difficulty.   His knowledge of the handwriting of Lambert was that acquired as teller of the Grocers' Bank; and he would have testified that Lambert kept a deposit account with the bank, and that he had seen and taken at the bank a large number of checks purporting to be drawn by Lambert, though he had not seen him write.   The ground, relied upon for the admission of this testimony, is that the witness, in the course of his business

as teller of the bank, had become familiar with the handwriting by which checks were drawn and indorsed in the name of George Lambert, which were accepted as his genuine signatures by the bank. This testimony was properly rejected. The only knowledge, which Smith professed to have, of the handwriting of Lambert, was derived from the fact that he had paid many checks, drawn on the Grocers' Bank, and purporting to be signed by Lambert; and this would have rendered him a competent witness, if there had been no other testimony on this point. But as it appeared that some of the checks so paid were forged, and that the witness paid alike forged and genuine checks, the witness clearly had no such knowledge of the handwriting of Lambert as to entitle him to testify to it. This case differs from that of *Amherst Bank* v. *Root*, 2 Met. 532, as the signatures, which had been so frequently before the witness there, were to papers of an official character, in reference to other matters, and having no connection with the paper, the subject of controversy; whereas here the checks were alleged to have been drawn by the same person who indorsed the note; and the fact that the name of Lambert, as written on the note, resembled that on the checks, did not advance the proof of its being the real signature of Lambert.

4. The proposed evidence of Wetherbee and Bolles that the signature on the back of the note in controversy was the signature under which Lambert's business had been transacted in 1849 and the early part of 1850, the period immediately preceding and subsequent to the date of this indorsement, ought, in our opinion, to have been admitted. It was no sufficient objection that the witnesses did not know that Lambert personally wrote his name on his business papers, or that there was evidence in the case tending to show that notes and checks bearing the name of Lambert, written by some other hand, were in general circulation. The proposed evidence had a tendency to show that this mode of signature was binding upon Lambert, either because it was his handwriting, or because he knowingly permitted his agent, Wellington, to use his name and signature, intending to give the same effect to it, as though

he had written it himself. If the note in controversy was indorsed in the same handwriting that Lambert had adopted as his, in his usual business transactions, it was competent for the defendant to show this fact. Chit. Bills, (9th Amer. ed.) 33. *Ereskine* v. *Murray*, 2 Ld. Raym. 1542, 1543. *Neal* v. *Erving*, 1 Esp. R. 61. *Barber* v. *Gingell*, 3 Esp. R. 60. *Watkins* v. *Vince*, 2 Stark. R. 368.

5. The next exception, that we have thought it important to consider, is to the instructions of the presiding judge on the effect of Lambert's knowledge of the whole transaction after it had occurred, and his neglect to repudiate the agency and authority of Wellington in relation to the same. The instructions to the jury did not, as it seems to us, fully meet the case as presented, and were not as favorable to the defendant as they should have been. The question here was, whether Lambert was not bound by the acts of Wellington, who, professing to act as his agent, had parted with this note in payment of one or more notes due from Lambert; the whole transaction having afterwards became known to Lambert and he having done nothing to repudiate it. The rule is a very stringent one upon the principal in such cases, where, with full knowledge of the acts of his agent, he receives a direct benefit from them, and fails to repudiate the acts. When the principal is informed of what has thus been done, he must dissent, and give notice of his dissent, within a reasonable time, and if he does not, his assent and ratification will be presumed. Paley on Agency, (3d Amer. ed.) 171, *note* (p). 2 Kent Com. 616. The court are of opinion that, if the jury found the fact to be, that this note was passed by Wellington to Way in payment of a debt or debts of Lambert, and that the fact of such transfer of the note for that purpose, with all the circumstances connected with the transaction, became known to Lambert, it was the duty of Lambert, within a reasonable time after notice came to him of said facts, to repudiate the transaction, and disavow the act of Wellington as unauthorized, and if he failed so to do, he would virtually ratify and adopt the act of his professed agent, and be bound by it. *Exceptions sustained.*